Leonard A. **LEBLANC**, Plaintiff,

v.

**UNITED PARCEL SERVICE, INC.,** Defendant.

No. 2:95–CV–68.

United States District Court, D. Vermont.

July 15, 1997.

*Doctrine To The Electronic Publishing Media And Beyond,* 143 U. Pa. L.Rev. 899, 929 (1995).

Jeffery Edward Tobin, Davis & Tobin, Barre, VT, for Plaintiff.

Sharon R. Burger, Nutter, McClennen & Fish, Boston, MA, Thomas J. Sherrer, Thomas J. Sherrer, P.C., Burlington, VT, for Defendant.

*OPINION AND ORDER*

SESSIONS, District Judge.

Plaintiff Leonard A. LeBlanc sued his former employer, United Parcel Service, Inc. ("UPS") alleging breach of an implied contract of employment, age discrimination, and intentional infliction of emotional distress in connection with his discharge from employment. In a previous opinion and order, this Court dismissed the age discrimination and intentional infliction of emotional distress claims. *Leblanc v. United Parcel Service, Inc.*, No. 2:95–cv–68, 1996 WL 192011 (D.Vt. Apr.2, 1996). UPS has now moved for summary judgment on LeBlanc's remaining claim of breach of an implied contract of employment. For the reasons that follow,

UPS's Motion for Summary Judgment (paper 33) is granted.

I. *Factual Background*

For purposes of this summary judgment motion, the following facts are undisputed. LeBlanc was employed by UPS from 1977 until April 8, 1994 when he was discharged. During his employment at UPS, he acquired stock in the corporation and participated in the corporation's thrift plan. LeBlanc had an unblemished disciplinary record prior to his discharge.

In 1988 LeBlanc was made a supervisor. When he became a supervisor, he received a copy of UPS's Policy Book. In January 1994 LeBlanc was an "on-car" supervisor in UPS's center in Barre, Vermont. His job responsibilities included supervising and training drivers.

On January 5, 1994, LeBlanc was training a UPS driver, Mark Gagnon, on a new route. He accompanied Gagnon on the route, but they were unable to deliver all of their packages before having to return to the Barre center in the evening to drop off packages they had picked up for air transport.

LeBlanc decided that they should go out again to deliver the remaining packages. Because the weather and road conditions were poor, he decided to use his car, thinking that it would perform better than the UPS vehicle. LeBlanc and Gagnon transferred the packages to LeBlanc's car and set out, both in UPS uniforms, LeBlanc driving.

After leaving the Barre center, LeBlanc stopped at a convenience store and bought two cans of beer. He drank one of the cans of beer while driving to deliver the remaining UPS packages.

Gagnon informed his union of this incident, which informed the Vermont Division Manager of UPS in late March 1994. UPS's Loss Prevention Manager, Cornell Atkins, interviewed LeBlanc about the matter on April 6, 1994. LeBlanc admitted that the incident had occurred. He explained that he considered that he was not on duty at the time because he was using his own car. The UPS investigator told LeBlanc that he did not think that LeBlanc would lose his job

over this incident. On April 8, 1994, however, the Vermont Division Manager and the district Human Resources Manager of UPS met with LeBlanc and invited him to resign. Upon his refusal to resign, they discharged him for drinking alcohol while driving to deliver UPS packages.

UPS strictly prohibits the use or possession of alcohol while on duty. Employees are not permitted to go on duty or remain on duty if they possess or consume any alcoholic beverage. The rule governs employees from the time they report to work until they leave the premises at the end of the working day. LeBlanc was informed of this rule when he was hired, in an "Employee Acknowledgment of Individual Responsibility," which he read and signed. This rule is also contained in UPS's Policy Book.

UPS has an Employee Assistance Program ("EAP") designed to provide assistance to UPS employees and family for drug or alcohol abuse. Employees are assured that participation in the EAP will not affect their job status. LeBlanc has never sought assistance through the EAP, nor has he sought or received counseling or medical care for alcohol use.

## II. *Discussion*

### A. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2552. The party opposing summary judgment may not rest on its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513, citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598,

1608–09, 26 L.Ed.2d 142 (1970). Unless there is sufficient evidence to enable a jury to return a verdict in favor of the nonmoving party, there is no issue for trial. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

### B. *At–Will Employment*

 Under Vermont law, employment contracts are presumed to be at-will, terminable at any time, for any reason or for no reason at all. *Sherman v. Rutland Hosp., Inc.*, 146 Vt. 204, 207, 500 A.2d 230, 232 (1985); *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 665 A.2d 580, 583 (Vt.1995). The at-will presumption may be overcome by evidence that the employer "has by express language or clear implication, foreclosed his right to terminate except for cause." *Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 270, 514 A.2d 716, 718 (1986).

 At-will employment contracts may be modified by express agreement, statute, public policy, promissory estoppel, the personnel policies or practices of the employer, or actions or communications by the employer reflecting assurances of continued employment. *Raymond v. International Business Machines Corp.*, 954 F.Supp. 744, 748 (D.Vt. 1997); *Foote v. Simmonds Precision Products Co.*, 158 Vt. 566, 570–71, 613 A.2d 1277, 1279–80 (1992).

LeBlanc relies on several factors to support his claim that his at-will employment status was modified to bar termination except for just cause: one, that specific provisions in UPS's Policy Book establish a just cause requirement; two, that UPS provided its employees with an EAP; three, that he was able to acquire stock in the company and to participate in the company's thrift plan; four, that he was told he probably would not lose his job over this incident, and five, that he had an exemplary record of service to the company over 17 years of employment. As discussed below, none of these factors, either singly or collectively, would permit a rational jury to find that LeBlanc's at-will employment status was modified.

### 1. *Policy Book*

■■ Personnel manual provisions inconsistent with an at-will relationship may be used as evidence that a contract of employment requires good cause for termination. *Taylor v. National Life Ins. Co.*, 161 Vt. 457, 464, 652 A.2d 466, 471 (1994). Whether a personnel manual's provisions have created an implied contract to terminate only for just cause will ordinarily be a question for the jury. *Farnum v. Brattleboro Retreat, Inc.*, 164 Vt. 488, 671 A.2d 1249, 1254 (1995). Where, however, the personnel manual's provisions would not permit a reasonable jury to find that an employee's at-will status was modified, summary judgment is appropriate. *Madden v. Omega Optical, Inc.*, 683 A.2d 386, 389 (Vt.1996).

■ In UPS's Policy Book, there is no reference to grounds or procedures for discipline or dismissal, or promises of continued employment. The Policy Book contains broad statements of general UPS policy.[1] It also specifically prohibits the use or possession of alcohol while on duty.[2]

■ Definitive policies, which expressly or impliedly include a promise for specific treatment in specific situations, may be enforceable in contract, but general statements of policy are not. *Ross*, 665 A.2d at 584. No promise for specific treatment or for termination only upon just cause can be implied from the general statements in UPS's Policy Book stressing fair treatment, cooperation, communication, and delegation of decision-making authority.

### 2. *EAP*

■ LeBlanc contends that company policy, as reflected in UPS's Employee Assistance Program, mandated that an employee's acknowledgment of alcohol use would not affect his or her job status. UPS's EAP provides assistance to employees with drug or alcohol problems through an assessment and referral service. Information concerning the employee's substance abuse problem or participation in the program is kept confidential, except where disclosure is required by law or company safety policy. A brochure describing the EAP states that

> UPS is guided by policies which reflect our concern for our people.... While such problems may be a reflection of society's ills, we recognize a responsibility to help our people find solutions.... The goal of the UPS's EAP is to provide a one-time assessment of your problem or your family's problem, and a referral to an appropriate community agency. This program will assist you in locating resources to help

---

1. The Policy Book provisions on which LeBlanc relies are reproduced below:

> **We Delegate Broad Authority to Our Managers....** We appoint people to the positions of managers and supervisors when we have confidence in their judgment and their ability to assume the responsibilities of their particular jobs. Once they have been appointed, we support them by continuing their training and by giving them the freedom to exercise their judgment and ability.
> **We Conduct Meaningful Talks With Our People.** Cooperation and teamwork among all our people are necessary to the continued success of our business. To foster this spirit, we seek to develop meaningful businesslike relationships and better communications by requiring our managers and supervisors to conduct regular and frequent planned individual and group talks, away from the normal work area, with everyone reporting to them.
> **We Treat Our People Fairly and Without Favoritism.**
> **We Keep Employees Informed About Company Activities and Plans That May Affect Them or Their Work....** To accomplish this, we hold pre-work and other periodic meetings.
> **We Separate Business and Social Functions.** Combining social and business functions can create conflicts, misunderstandings ...

LeBlanc Dep. at 20–23 (paper 37, att. A); Policy Book at 20, 29, 32, 34, 47 (paper 38, att. A).

2. **We Prohibit the Use or Possession of Alcoholic Beverages or Controlled Substances While on Duty.** Employees are not permitted to go on duty or remain on duty if they possess or are using any of the following:

> an alcoholic beverage, regardless of its alcoholic content ... This rule governs employees from the time they report to work until they leave our premises at the end of the working day.
> The rule reflects current laws and government regulations that strictly prohibit the use or possession of any illicit substances by those who operate our air and ground vehicles, as well as those in other specified jobs. These regulations also contain prohibitions against employees' use of alcoholic beverages before they go on duty.

Policy Book at 32 (paper 38, att. A).

resolve your problems, so that you may continue or return to satisfactory job performance.

LeBlanc Dep. at 17–19 (paper 37, att. A); EAP brochure (paper 38, att. D). LeBlanc has produced no evidence that the EAP explicitly provides that acknowledgment of alcohol use would not affect his job, nor can this be implied from the EAP brochure. Furthermore, at no time did LeBlanc seek assistance through the EAP.

The fact that a company encourages its employees to seek assistance for substance abuse problems by making available an assessment and referral service does not suggest to the rational factfinder that an employee who drinks a can of beer on the job in violation of express UPS policy is immune from being fired for that behavior.

### 3. *Stock Acquisition and Thrift Plan*

While employed at UPS, LeBlanc was able to participate in UPS's Thrift Plan, an employee pension benefit plan, and, after he became a supervisor, to acquire stock through its Management Incentive Plan. LeBlanc has provided no support for his contention that his participation in these programs obliged UPS to discharge him only for just cause, or altered his at-will status in any way.

### 4. *Management Assurances*

■ UPS Loss Prevention Manager Atkins interviewed LeBlanc on April 6, 1994. LeBlanc admitted to him that he had drunk a beer while he and Gagnon were delivering packages, but that he didn't consider himself as having been on duty at the time. According to LeBlanc, Atkins told him that he would have to meet with the District Manager who would give him a "very strict talking to," but that he probably wouldn't lose his job over the matter. LeBlanc Dep. at 109 (paper 37, att. A); Plaintiff's Answers to Interrogatories ¶ 8 (paper 37, att. C); Plaintiff's Statement of Undisputed Facts ¶ 9 (paper 41).

■ LeBlanc claims that this reassurance from Atkins could lead a reasonable jury to find that his at-will employment status was modified to require discharge only

upon just cause. An employee and an employer may contractually bind themselves to certain termination procedures. *Sherman,* 146 Vt. at 207–08, 500 A.2d 230. Only those statements, however, which are "definitive in form, communicated to the employee, and demonstrate an objective manifestation of the employer's intent to bind itself will be enforced." *Madden,* 683 A.2d at 390, quoting *Ross,* 665 A.2d at 584. Vague assurances of continued employment will not constitute an implied contract for just cause termination. *Marcoux–Norton v. Kmart Corp.,* 907 F.Supp. 766, 775 (D.Vt.1993).

The Court finds that Atkins' statement is insufficient as a matter of law to show that LeBlanc's at-will status was modified to require just cause for discharge. There is no evidence that UPS intended to bind itself not to fire LeBlanc, nor can such an inference be drawn from the nature and context of the statement itself. Plaintiff's own characterization of the statement, in his answers to interrogatories and in his statement of undisputed facts, is that it was an expression of Atkins' opinion of the probable outcome of the matter. The statement does not constitute an enforceable promise either not to fire LeBlanc over this incident, or to require just cause for his termination generally. Mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion. *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

### 5. *Length of Service and Work History*

■ LeBlanc claims that the fact that he had an unblemished disciplinary record over 17 years of employment with UPS modified his at-will employment status to require just cause for discharge. As previously stated, an at-will employee may be discharged at any time with or without cause, unless there is a clear and compelling public policy against the reason advanced for the discharge, or unless the at-will relationship has been modified. *Ross,* 665 A.2d at 586. The at-will relationship is presumed unless the employer has by express language or clear implication, foreclosed his right to terminate

except for cause. *Benoir,* 147 Vt. at 270, 514 A.2d 716.

LeBlanc has not indicated how his length of service and work history modified his at-will status, either expressly or by implication, on the basis of any exception to the at-will doctrine recognized by Vermont courts. *See Foote,* 158 Vt. 566, 570–71, 613 A.2d 1277 (listing modifications and exceptions to the at-will doctrine). In the absence of evidence, case law or argument, this Court has no reason to predict that the Vermont Supreme Court would rule that longevity and a good work history alone will modify an at-will employment relationship.

### C. *Just Cause*

Given this Court's conclusion that as a matter of law LeBlanc's at-will employment contract was not modified to require just cause for discharge, it is unnecessary to reach the issue of whether UPS had good cause to discharge LeBlanc. In any event, UPS had good cause to discharge him. Just cause for termination of employment has been defined as "some substantial shortcoming detrimental to the employer's interests, which the law and a sound public opinion recognize as a good cause for dismissal." *Nadeau v. Imtec, Inc.,* 164 Vt. 471, 670 A.2d 841, 844 (1995). A just cause dismissal will be upheld if it is reasonable to discharge employees for the conduct at issue, and if the employee had fair notice that the conduct would be ground for discharge. *Id.; In re Brooks,* 135 Vt. 563, 568, 382 A.2d 204, 207–08 (1977).

LeBlanc admitted that he drank a beer while in uniform and while driving to deliver packages for UPS. Although he may honestly have felt that he was off duty because he was using his own vehicle, this conduct violated the express terms of UPS's Policy Book, as well as state law and federal regulation. Policy Book at 32 (paper 38, att. A); Vt. Stat. Ann. tit. 23, § 1134 (1987); 49 C.F.R. § 392.5 (1997). LeBlanc knew that consuming alcohol at work was against UPS policy, and acknowledged that it was grounds for disciplinary action. LeBlanc Dep. at 88, 163, 165–66 (paper 37, att. A); Employee Acknowledgment of Individual Responsibility (paper 37, att. D). LeBlanc has not argued that he did not have fair notice. As a matter of law, LeBlanc's conduct was reasonable grounds for discharge.

### III. *Conclusion*

UPS's Motion for Summary Judgment (paper 33) is GRANTED. UPS's Motion to Compel (paper 30) is DENIED as moot.